IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 09-cv-00856-PAB-KLM

PRECISION CONCRETE CUTTING, INC.,
a Utah corporation,

    Plaintiff,

v.

CONCRETE SIDEWALK SOLUTIONS, INC.,
a Colorado corporation doing business as Sidewalk Shavers of Colorado,

    Defendants.

_____

**ORDER**
_____

This matter is before the Court for the construction of U.S. Patent No. 7,402,095 (the "'095 Patent") [Docket No. 55-2 at 15-34] and U.S. Patent No. 7,143,760 (the "'760 Patent") [Docket No. 55-2 at 39-58], both assigned to plaintiff Precision Concrete Cutting, Inc. Precision Concrete has brought suit against defendant Concrete Sidewalk Solutions, Inc., alleging that defendant has practiced methods described by the patents at issue here. Defendant defends by asserting that it has not infringed the patents and, alternatively, that the patents are invalid. At this stage, however, the Court is called upon to determine what certain disputed terms in the patents mean. The parties have filed claim construction briefs, and the Court held a *Markman* hearing on April 22, 2010, during which the parties offered additional evidence and argument in support of their proposed claim constructions.[1]

---

[1] In *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), the Supreme Court determined that claim construction is an issue of law for the court to resolve after

## I. LEGAL STANDARDS FOR PATENT CLAIM CONSTRUCTION

Claim construction is a question of law for the court. *See, e.g.*, *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). In construing patent claims, courts are guided by the precedent of the Federal Circuit. *See SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333 (Fed. Cir. 1999). As that court has explained, "there is no magic formula or catechism for conducting claim construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc). Even so, the *Phillips* decision outlined several key sources and doctrines that should be consulted and applied, while making clear that "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.*

Courts begin with the "bedrock principle" that "'the claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The words of the claims "'are generally given their ordinary and customary meaning,'" *id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," *id.* at 1313; *see CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally

---

considering evidence and argument regarding the proper interpretation of the patent claims. As a result, many courts, including the court in this case, hold so-called "*Markman* hearings" to address construction.

speaking, [courts] indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning."). Sometimes, when the claim language "involves little more than the application of the widely accepted meaning of commonly understood words," construction is relatively straightforward and "the ordinary meaning . . . may be readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. However, when the claim terms have a particular meaning in the field, courts "look[ ] to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova*, 381 F.3d at 1116). These sources include "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.*

Importantly, claim terms are not read in a vacuum. *Id.* at 1313. The context in which a term is used, both in the asserted claim as well as in other claims of the patent, can be valuable and instructive. *Id.* at 1314. In addition, the patent specification – the text and figures of the patent that precede the claims – "'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). Courts also consider the patent's prosecution history – the official record of the patent application and subsequent process before the U.S. Patent and Trademark Office. *Id.* at 1317. That history "provides evidence of how the PTO and the inventor understood the patent." *Id.* However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, . . . it often lacks the clarity of the

3

specification and thus is less useful for claim construction purposes." *Id.*

Courts may consult extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." *Id.* However, this evidence is "'less significant than the intrinsic record,'" i.e., the specification and prosecution history, *id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)), and courts must be wary not to use extrinsic evidence to override the meaning of the claim terms demonstrated by the intrinsic evidence. *Id.* at 1318-19. That is, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

In sum, a court's basic role is to construe the claim terms as they would be viewed by "the ordinary artisan after reading the entire patent." *Id.* at 1321. This is crucial in order to respect the public notice function of patents:

> The patent system is based on the proposition that claims cover only the invented subject matter. As the Supreme Court has stated, "[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."

*Id.* at 1321 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 573-74 (1876)). With these principles in mind, I turn to the claims at issue.

## II. ANALYSIS

The two patents at issue describe methods for removing trip hazards in concrete sidewalks. As background, both patents state that, "[h]istorically, trip hazards caused by uneven lifting and settling of contiguous sidewalk sections have been eliminated either by tearing out the old concrete and replacing it with new slabs having no abrupt

4

transitions between joints, by forming a transition ramp on the lowermost section with macadam, or by creating a chamfer on the edge of the uppermost section." '095 Patent col. 1 ll. 59-65; '760 Patent col. 1 ll. 60-66. The patents "provide[] both a method and apparatus for cutting a chamfer on an upper edge of a concrete slab,"[2] '095 Patent col. 2 ll. 22-23; '760 Patent col. 2 ll. 24-26. The '095 Patent has fourteen claims; the '760 patent has twenty claims. These claims are required to "define particularly and distinctly the subject matter that the inventor regards as his or her invention"; they "set the metes and bounds of the patent owner's exclusive rights." Herbert F. Schwartz & Robert J. Goldman, *Patent Law and Practice* 16 (6th ed. 2008).

The parties' disagreement regarding claim construction involves Claims 1 and 8 of the '095 Patent and Claims 1 and 11 of the '760 Patent. Claim 1 of the '095 Patent describes the following:

> A method for cutting a chamfer on an edge of a concrete slab, the method comprising the steps of:
> > making a generally planar cut, beginning a distance from the edge, with a generally circular, generally laminar concrete saw blade rotatably powered by a right-angle grinder motor, the generally planar cut being made at a desired angle and creating a cantilevered ledge above the generally planar cut;
> > striking the cantilevered ledge with a tool in order to fracture and remove at least a portion of the cantilevered ledge from the slab whenever an edge of the cantilevered ledge is proximate the hub; and
> > continuing the generally planar cut until the cantilevered ledge is severed from the slab.

'095 Patent col. 8 l. 60 - col. 9 l. 6. Claim 8 of the '095 Patent describes the following:

> A method for cutting a chamfer along an upper abutting edge of a first of two abutting concrete slabs, the abutting edge of the first concrete slab being

---

[2] A "chamfer" is "[a] flat surface made by cutting off the edge or corner of a block of wood or other material." *The American Heritage Dictionary* (4th ed. 2009).

elevated above an upper surface of the second concrete slab, the method comprising the steps of:
> making a generally planar cut, beginning a distance from the upper edge of the first concrete slab, with a generally circular, generally laminar concrete saw blade rotatably powered by a right-angle grinder motor, the generally planar cut being made at a desired angle selected so that a projection of a bottom surface of the planar cut intersects an upper abutting edge of the second concrete slab, the generally planar cut creating a cantilevered ledge above the planar cut;
> striking the cantilevered ledge with a tool in order to fracture and remove at least a portion of the cantilevered ledge from the slab whenever an edge of the cantilevered ledge is proximate the hub; and continuing the generally planar cut until the cantilevered ledge is severed from the slab.

'095 Patent col. 9 l. 27 - col. 10 l. 12.

Claim 1 of the '760 Patent describes the following:

A method for cutting a chamfer on an edge of a concrete slab, the method comprising the steps of:
> providing a generally circular, rotatable concrete saw blade that is coupled to a right-angle grinder motor with a blade-mounting hub having no blade attachment hardware projecting below a lower major surface of the blade;
> making a planar cut at a desired angle beginning a distance from said edge, the planar cut creating a cantilevered ledge above the planar cut;
> fracturing and removing at least a portion of the cantilevered ledge from the slab whenever an edge of the cantilevered ledge is proximate the hub; and
> continuing the planar cut until the cantilevered ledge is severed from the slab.

'760 Patent col. 9 ll. 6-20. Claim 11 provides for the following:

A method for cutting a chamfer along an upper abutting edge of a first of two abutting concrete slabs, said abutting edge being elevated above an upper surface of said second concrete slab, the method comprising the steps of:
> providing a generally circular, rotatable concrete saw blade that is coupled to a right-angle grinder motor with a blade-mounting hub having no blade attachment hardware projecting below a lower major surface of the blade;
> making a planar cut at a desired angle beginning a distance from said

upper abutting edge, said desired angle being selected so that a projection of a bottom surface of the planar cut intersects an upper abutting edge of the second concrete slab, the planar cut creating a cantilevered ledge above the planar cut;

fracturing and removing at least a portion of the cantilevered ledge from the slab whenever an edge of the cantilevered ledge is proximate the hub; and

continuing the planar cut until the cantilevered ledge is severed from the slab.

'760 Patent col. 9 l. 65 - col. 10 l. 18.

The following figures from the '095 Patent depict the method:





**A. Claims 1 and 8 of the '095 Patent**

The parties dispute what the '095 Patent means when it describes a "generally planar cut," a "generally laminar concrete saw blade," "striking," and "hub" in Claims 1 and 8.[3]

---

[3]The parties agree that, to the extent the same terms appear in both patents, they should be construed the same.

### *1. Generally planar cut*

Claims 1 and 8 of the '095 Patent describe "making a generally planar cut." Plaintiff proposes that "generally planar cut" be construed to mean "[a] penetration with or as if with an edged instrument that results in a surface that is, from the perspective of ordinary observers, considered to be flat." Docket 55-1 at 5. Defendant proposes that "planar cut" be defined as a "cut made at an angle planar with the leading and trailing edge of the blade." Docket No. 58 at 15; *see id.* (explaining its position that "the cut is required to be on [a] plane with the flattened blade['s] lower surface, as shown in . . . Fig. 25, because the purpose was to have a cut made with a blade with no attachment hardware projecting below the lower surface of the blade, hence 'planar'").

The parties' proposed constructions complicate what is otherwise a clear phrase. Neither party identifies any reason why an individual schooled in the art would not understand the phrase "generally planar cut" to mean a cut largely or basically made along a plane, a construction consistent with the claim language and specifications. The word "generally" accounts for the fact that the cut may not be precisely along a plane but rather will reflect the attempt to make a cut along a plane. *See Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003) (noting that "words of approximation, such as 'generally' . . ., are descriptive terms commonly used in patent claims 'to avoid a strict numerical boundary to the specified parameter'" and holding "that the phrase 'generally parallel' envisions some amount of deviation from exactly parallel"); *see also Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1368 (Fed. Cir. 2004). As a result, there is no need to import

9

limitations found in descriptions of preferred embodiments found in the specifications. *See Liquid Dynamics*, 355 F.3d at 1368 ("Because the plain language of the claim was clear and uncontradicted by anything in the written description or the figures, the district court should not have relied upon the written description, the figures, or the prosecution history to add limitations to the claim."). Moreover, given that the '095 Patent's broad language encompasses engaging in the method with attachment hardware extending below the lower surface of the blade, *see infra*, it would be more difficult to cut along a smooth plane.

And, given the need to break off pieces of concrete periodically, the cuts will not be continuous or perfectly straight regardless of the apparatus used. That lack of perfection is, therefore, part of the meaning of "planar cut," as used in both the '095 and '760 Patents at issue in this case. Yet, in the '760 Patent, the term "generally" does not appear before "planar cut." The '760 Patent is more limited in scope than the '095 Patent, requiring that the "attachment hardware [not] project[] below a lower major surface of the blade." With that limitation, the "planar cut" is potentially a more precise cut that more closely aligns with the plane of the blade. While it might be more precise – closer to a perfect plane – the cuts made by an apparatus with or without protruding attachment hardware will suffer from the imperfections inherent to use of a handheld device to cut concrete in the manner described. In both cases, one engaged in the methods will attempt to make a cut along a plane. The "generally planar cut" of the '095 Patent often will be more imprecise when using a blade with protruding attachment hardware than the "planar cut" of the '760 Patent, where such hardware will never so protrude below the surface of the blade.

### 2. *Generally laminar concrete saw blade*

Plaintiff proposes that "generally laminar concrete saw blade" be construed to mean "[a] thin rotating tool of generally constant thickness having a cutting edge." Docket No. 55-1 at 8. At the claim construction hearing, defendant stated that "[t]he generally laminar portion" will not be "determinative of the outcome of this case." Rather, defendant focuses on "blade" and construes the term to require "blade attachment holes having a [sic] countersinks recessed in the lower surface, so that no attachment hardware projects below the lower surface of the blade." Docket No. 58 at 4.

The construction of this phrase will not include reference to the blade being circular or to the fact that it rotates. These qualities are addressed elsewhere in the claim and would, if included herein, be redundant. Before this disputed term, the claim provides that the blade is "generally circular" and, after the term, it provides that the blade is "rotatably powered." Turning to defendant's proposed construction of "blade," the method claimed by the '095 Patent is not limited to the use of a blade with a "countersunk lower surface." While that is the preferred embodiment of an apparatus used to conduct the method, the claimed method is not so constrained. *Cf. Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("It is axiomatic that claims, not the specification embodiments, define the scope of protection.") (citation omitted); Herbert F. Schwartz & Robert J. Goldman, *Patent Law and Practice* 134 (6th ed. 2008) ("A recurring dispute in claim construction, and a frequent source of reversal by the Federal Circuit, arises where the court reads features of one or more disclosed embodiments into claims that are drafted more broadly.") (collecting Federal Circuit

11

cases). The phrase "generally laminar concrete saw blade" can be construed without reference to any particular preferred embodiment of the apparatus. Moreover, there is no need to import the "cutting edge" proposed by plaintiff, as that is understood and obvious from the term "blade" and the described method. The Court, therefore, construes "blade" to mean a sharp cutting instrument. The surrounding language in the claim and the specifications make clear that it is a blade that can cut concrete, is generally circular, and rotatable.[4] The blade, even if it has a slightly raised cutting edge or a thicker center where it attaches to the hub, must permit a "generally planar cut." Therefore, the Court concludes that, by "generally laminar," the claim means that the circular, rotatable blade is, overall, thin and flat.[5]

---

[4] Defendant cites the "Remarks" section of the patent applicant's response to a Patent and Trademark Office Action where the applicant distinguished a reference, in part, by noting that the apparatus described in the reference "include[d] attachment hardware that projects from the bottom of the cutting blade." Docket No. 58-2 at 3. That assertion is insufficient on its own to limit what is otherwise a broader claim, particularly when it is viewed in its full context. As defendant quotes, the response states that a "thorough review of the . . . reference indicates that it has very little relevancy to the present invention." *Id.* Defendant, however, omits the following: "The device disclosed by that reference was designed primarily to cut out mortar joints between stone and bricks masonry, and to use a stream of water directed at the cutting blade to both cool the blade and eliminate dust. The specification fails to disclose anything that might be considered a process for cutting a chamfer on an edge of a concrete slab. There is no mention of creating a cantilevered edge above the cut, no mention of fracturing and removing the cantilevered edge, and no mention of continuing the cut until the cantilevered ledge is severed from the slab." *Id.* ("Even the equipment of the reference would be a poor choice for implementing the method of the present invention.").

[5] In other words, the Court finds that, by using the adjective "laminar," the patent describes a blade that has the quality of a "lamina," or "a thin plate or scale : LAYER." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *id.* (defining "laminar" as "arranged in, consisting of, or resembling laminae"); *cf. Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such

### 3. Striking

For the term "striking," plaintiff offers the following construction: "The physical coming together of two or more things; the act of contacting one thing with another; to aim and usually deliver a blow, stroke, or thrust; to come into contact forcefully to affect as if by contact." Docket No. 55-1 at 9. Defendant replies that the term should be construed to mean "hitting that portion of the ledge next to the hub with a separate tool." Docket No. 58 at 12. The context in which the term is used in the claim – i.e., "striking the cantilevered ledge with a tool in order to fracture and remove at least a portion of the cantilevered ledge" – as well as the specifications – i.e., "the cantilevered ledge has been fractured by hitting it with a hammer or other similar instrument," '095 Patent col. 8 ll. 19-21; *id.* at ll. 34-36 – make clear that the term "striking" has its ordinary meaning of "hitting sharply."[6] The parties do not identify any basis to conclude that one skilled in the art would give the term a different meaning.

To the extent plaintiff offers definitions that imply a physical meeting without any measure of force, they do not comport with the context in which the term "striking" appears. And defendant's inclusion of "with a tool" in its proposed construction is

---

cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful.") (citation omitted).

[6]The Reasons for Allowance section of the prosecution history provides, *inter alia*, that the "allowable subject matter as set out in the specification was the use of the cutting saw blade to cut out a cantilevered ledge and striking said ledge with a separate tool in order to fracture and remove part of the ledge in combination with the other claimed limitations." Docket No. 58-5 at 3; *cf. The American Heritage Dictionary* (4th ed. 2009) ("1.a. To hit sharply, as with the hand, the fist or a weapon. b. To inflict (a blow) . . . . d. To cause to come into violent or forceful contact.").

13

unnecessary and would be repetitive. The claim already contains the phrase "with a tool." The claim describes hitting the cantilevered ledge sharply – "striking" it – with a tool so as to fracture, and enable removal of, at least a portion of the cantilevered ledge.

### *4. Hub*

As an initial matter, defendant points out that the term "the hub" lacks an antecedent basis in the patent. *See* Docket No. 58 at 7 n.2 ("Defendant believes, and will argue that because the two broad claims (1 and 8), of the '[095] method, do not include an antecedent basis describing '*the hub*', as used in the second step of claims 1 and 8 ('striking . . . whenever an edge of the cantilevered ledge is *proximate* the *hub* . . . .'), that the patent is invalid under 35 U.S.C. § 112, as indefinite unless a reasonable construction can be made.") (emphasis in original). "An analysis of claim indefiniteness under § 112 is 'inextricably intertwined with claim construction.'" *Energizer Holdings, Inc. v. International Trade Commission*, 435 F.3d 1366, 1368 (Fed. Cir. 2006) (quoting *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999)). Such is the case because "[c]laims are considered indefinite when they are 'not amenable to construction or are insolubly ambiguous.'" *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)). "'Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning.'" *Id.* (quoting *Datamize*, 417 F.3d at 1347). In this case, while defendant points out the lack of an antecedent basis for "the hub," it does not argue that the term is not amenable to construction or

insolubly ambiguous. Rather, it offers what it contends is a well-supported construction of the term in light of the claim language and specifications. That plaintiff disagrees with that construction does not render the claim language indiscernible. *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("[I]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable person will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."). The Court concludes, as did the court in *Energizer Holdings*, 435 F.3d at 1371, that, "[h]ere, it is apparent that the claim can be construed."

For the construction of the term "hub," plaintiff proposes "the apparatus to which a rotatable concrete cutting blade is attached and which mounts on the spindle of the right-angle grinder motor." Docket No. 55-1 at 9. In response, defendant first requested the following: "In its first embodiment, the term 'hub' requires a unitary body with a collar equipped with at least two flattened sides, and a flange equipped with at least two countersunk holes and blade centering shoulder." Docket No. 58 at 7. At the *Markman* hearing, defendant changed that construction to "at least one countersunk hole" as opposed to a flange with at least two countersunk holes. Later, during the same hearing, defendant sought to add to its proposed construction that the hub could have at least one countersunk screw hole or place for a countersunk nut.

Defendant's proposals rely on the description and depiction of the preferred embodiments of the apparatus used for the method. *See, e.g.*, '095 Patent col. 2 ll. 28-30 ("For a *presently preferred embodiment of the hub*, an attachment collar is unitary

15

and concentric with both a blade mounting flange and a blade centering shoulder on the flange. . . .") (emphasis added); 095 Patent col. 2 ll. 56-58 ("Third and fourth embodiment apparatuses employ a hub having a central aperture machined for close tolerance mounting on the output spindle of the right-angle grinder."). The claim itself, however, does not so limit the meaning of hub. Instead, the claim addresses what must be done when the cantilevered ledge nears that portion of the apparatus where the blade attaches to the spindle, i.e., the hub. Nothing in the claim language appears to require the additional limitations imported by defendant to engage in the method claimed. *See SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim. For example, a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment."); *Comark Communications v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998). "Claims of a patent may only be limited to a preferred embodiment by the express declaration of the patentee, and there is no such declaration here." *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005). Rather, as plaintiff proposes, the claim's use of the term "hub" refers to the "apparatus to which a rotatable concrete cutting blade is attached and which mounts on the spindle of the right-angle grinder motor."

### B. Claims 1 and 11 of the '760 Patent

The parties dispute what the '760 Patent means when it describes a "blade-

mounting hub," "attachment hardware," and "fracturing" in Claims 1 and 11.

### 1. Blade-mounting hub

The parties do not offer different proposals for this term than they have for "hub" in the '095 Patent. During the *Markman* hearing, defendant cited the '760 Patent specifications which provide that the "blade is equipped with countersunk holes which align with those on the blade mounting flange. Countersinking screws are employed to affix the blade to the blade mounting flange." '760 Patent col. 2 ll. 48-51. Like the '095 Patent, however, those features are aspects of a "presently preferred embodiment." '760 Patent col. 2 l. 30. Moreover, "[t]hird and fourth embodiment apparatuses employ a hub" that does not use countersinking screws to attach the blade. *See* '760 Patent col. 2 l. 59 - col. 3 l. 4. In short, the Court sees no reason to construe the term "hub" differently in the '760 Patent than in the '095 Patent.[7]

### 2. Attachment hardware

For "attachment hardware," plaintiff proposes the following definition: "Articles made of metal used to secure the concrete blade to the blade-mounting hub." Docket No. 55-1 at 13. Defendant proposes "a countersinking screw so that no portion of the screw projects below the lower surface of the blade." Docket 58 at 11. As noted above, the claim contains the limitation that the "attachment hardware [not] project[] below a major surface of the blade." Therefore, the claim separately addresses the limitation defendant requests; that limitation is not an aspect of the meaning of

---

[7]The '760 Patent's inclusion of the additional limitation that the "blade-mounting hub" has "no blade attachment hardware projecting below a lower major surface of the blade" would seem to only reinforce the Court's construction of "hub" in the '095 Patent as not importing such limitations.

"attachment hardware," which has a common meaning that would cover screws or nuts that did project below the surface of the blade. Therefore, the Court finds that "attachment hardware" means the metal articles used to secure the concrete saw blade to the blade-mounting hub. Defendant identifies no reason for the Court to venture beyond the clear claim language. In fact, to the contrary, defendant simply directs the Court's attention to other claim language which clearly accounts for the limitation it seeks.

### 3. Fracturing

Defendant did not brief the term "fracturing," though it argued at the *Markman* hearing that the term incorporates the definition of "striking," i.e., hitting the ledge with a tool. Claims 1 and 11 of the '760 Patent, however, do not contain the phrase "striking the cantilevered ledge with a tool in order to fracture and remove," but instead say "fracturing and removing." Defendant cites the specifications in support of its importation of "striking" into its proposed definition of "fracturing." *See* '760 Patent col. 8 ll. 46-48 ("Referring now to FIG. 30, the second cantilevered ledge . . . has been fractured by hitting it with a hammer or other similar instrument."). But the claim does not limit the means of fracturing in that way and nothing in the specifications, or elsewhere, indicates that "striking" the ledge is the only means of "fracturing" covered by the claim.

Plaintiff proposes that the Court construe "fracturing" to mean "[t]o cause to break; the act of cracking something." Docket No. 55-1 at 14. While such definitions comport with the common understanding of "fracturing," they are too broad – in light of the stated purpose of the invention – insofar as they would cover cracking of a sort

18

insufficient to permit removing a portion of the ledge. Therefore, the Court construes "fracturing" to mean breaking or cracking to a degree sufficient to allow removal of at least a portion of the cantilevered ledge.

DATED April 30, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge